**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8                     IN THE UNITED STATES DISTRICT COURT

9                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   NATHAN LEE DAVISON,                )   No. C 10-02689 EJD (PR)
                                        )
12              Petitioner,             )   **ORDER DENYING PETITION FOR**
                                        )   **WRIT OF HABEAS CORPUS;**
13        v.                            )   **DENYING CERTIFICATE OF**
                                        )   **APPEALABILITY**
14                                      )
     G. SWARTHOUT, Warden,              )
15                                      )
                Respondent.             )
16                                      )
                                        )
17   _____)

18        Petitioner has filed a <u>pro se</u> petition for a writ of habeas corpus under 28

19   U.S.C. § 2254 challenging his state conviction.  For the reasons set forth below, the

20   Petition for a Writ of Habeas Corpus is **DENIED**.

21

22                              **BACKGROUND**

23        Petitioner was found guilty by a jury in Lake County Superior Court of first

24   degree murder, the personal use of a firearm, and the personal and intentional

25   discharge of a firearm.  On October 16, 2006, Petitioner was sentenced to forty-five

26   years to life in state prison.

27        Petitioner appealed the conviction.  The California Court of Appeal affirmed

28   the judgment on August 27, 2008.  (Ans. Ex. 7.)  On December 10, 2008,  the

1    California Supreme Court denied review.  (Id., Ex. 9.)

2          On February 1, 2010, Petitioner filed a petition for writ of habeas corpus with

3    the California Supreme Court, which denied the petition on September 15, 2010,

4    citing In re Robbins, 18 Cal.4th 770, 780 (1998).[1]  (Id., Ex. 11.)

5          While his state habeas petition was still pending, Petitioner filed the instant

6    federal habeas action on June 21, 2010.  After the state high court denied his petition

7    on September 15, 2010, Petitioner filed an amended federal habeas petition on

8    September 28, 2010, which is the operative petition in this matter.[2]  (Docket No. 3.)

9

10                          **FACTUAL BACKGROUND**

11          The following facts are taken from the opinion of the California Court of

12    Appeal:

13          [Petitioner] was charged with the murder of Tracy Lyons
       (Lyons).  Lyons's body was never found, though no witnesses saw or
14       heard from him after January 1998.  The evidence supporting
       [Petitioner]'s conviction came primarily from two sources: Jillian
15       Davison, his ex-wife and Lyons' step-daughter (Jillian [FN2]), and
       Debra Lyons, Jillian's mother and Lyons's wife (Debra).

16          FN2. We refer to certain witnesses by their first names for
17       clarity, because they share the same last names as appellant or
       the victim.  No disrespect is intended.

18          Jillian grew up in a religious family consisting of her mother
19       Debra, her brother James (James), and her stepfather Lyons.  The
       family attended the Seventh Day Adventist Church in Lake County.
20       Jillian and James attended the Seventh Day Adventist School, where
       Debra worked as a teacher's aide.

21          Lyons began molesting Jillian when she was five years old,
22       and continued until she was nine.  At that point, Jillian told a friend
       at the church school, who told a teacher.  Lyons was arrested and
23       convicted of molesting Jillian.  He served time in prison, and after a

24

25        [1]A California court's citation of In re Robbins, 18 Cal. 4th 770, 780 (1998), is
    a clear ruling that the petition was untimely.  Thorson v. Palmer, 479 F.3d 643, 645
26    (9th Cir. 2007) (denial of petition with citation to Robbins at page opinion discusses
    timeliness determinations was clear denial on timeliness grounds and therefore
27    petition was neither "properly filed" nor "pending").

28        [2]The Court denied Respondent's motion to dismiss the petition as timely on
    March 8, 2013, and directed Respondent to answer on the merits.  (Docket No. 68.)

*United States District Court*
For the Northern District of California

period of parole, returned to live with Debra on a 40-acre property she owned in Lake County (the Ranch). Debra let him move back in with her, Jillian, and James because "God... really doesn't want us to get divorced," she still cared about him, and Lyons "was very handy at... fixing stuff."

Jillian moved out of the family home when she was 17 years old. She moved in with Cherie Jensen (Cherie), with whom she worked. Jillian told [Petitioner] about the years of molestation. [Petitioner] was outraged and told her many times that Lyons should die, and that he would kill him. He told Jillian "he wanted to do it for [her]... to give [her] peace of mind...." [Petitioner] also disliked Debra because he blamed her for Jillian's molestation and because she let Lyons move back in with the family after he served his prison sentence.

In January 1998, [Petitioner] and Jillian were living together in a cottage located in a trailer park in Lake County. Debra was living with Lyons on the Ranch, which was located near Jillian and [Petitioner]'s home, two and one-half miles up a dirt road. Debra and Lyons purchased the Ranch together, but Lyons later quitclaimed his interest to her during the period of time he was on parole and living elsewhere.

In early January 1998, Debra came to stay with [Petitioner] and Jillian for a few days. Her car had broken down, and she did not want to rely on Lyons to drive her because she "didn't want him to keep [her] from seeing Jill[ian]." She did not want Lyons to have "total control over what [she] did for that whole week...." Debra explained that she and Lyons got along but they "just didn't talk to each other. It was better that way."

While Debra was staying with [Petitioner] and Jillian, she saw [Petitioner] holding a small, black, ".22" handgun. Debra knew it was a .22 handgun because [Petitioner] "said it was a .22 And he also said it misfired too so he had to be careful." Sometime before January 1998, Jillian also saw [Petitioner] with a small handgun, but Jillian recalled it being silver.

About three days after Debra began her stay with [Petitioner] and Jillian, [Petitioner] told them he was going to kill Lyons and left for the Ranch, which was "up the hill" from [Petitioner]'s and Jillian's residence. [Petitioner] was gone for a "little while." When he returned, he said he had killed Lyons. He told Jillian and Debra that "[h]e went up there, and he was talking to [Lyons]. [Lyons] was at the back of his truck, and [Lyons] turned around to unload dog food off of the truck, and he shot him in the head. [Lyons] fell down. He was still moving, and [Petitioner] shot him again." [Petitioner] was so upset while telling Jillian and Debra that he was "shaking, vomiting, and he looked just wide eyed and astonished... [and] he just kept repeating... I did it, I did it."

[Petitioner] told the women he wanted them to return to the Ranch with him, which they did. Debra testified that [Petitioner] "wanted to know where the chainsaw was, the electric chainsaw."

United States District Court

For the Northern District of California

1    [Petitioner] asked whether the electric chainsaw or the "kind that you
2    had to pull and start" would be better to cut up the body.  Lyons had
     bought the electric chainsaw for Debra because she "had a hard time
     using the other chainsaw. [The electric chainsaw] made it easier for
3    [her] to cut wood."

4         Debra testified that "Jill[ian] and I were in the back room
     praying, and [Petitioner] was – you could hear the generator go up
5    and down as the chainsaw would go on and off, and he cut [Lyons's]
     body up into pieces."  Debra was afraid [Petitioner] "would do
6    something to me because he never liked me."  [Petitioner] came back
     into the house, and asked for large plastic bags.  He said he was
7    "Going to put the body parts in that."  Debra told him she did not
     want to touch the bags, but [Petitioner] told her to take them out of
8    the box.  [Petitioner] took the bags and went back outside.  He
     returned, and wanted Debra and Jillian to start a fire in a 55-gallon
9    drum so he could burn the body.  They tried to start a fire, but it was
     raining and too wet.

10
11        [Petitioner] decided to "load [Lyons's] body in a barrel and
     put it in the back of the truck and take it somewhere and bury it."
12   [Petitioner] asked Jillian to go with him in Lyons's truck because he
     needed someone to hold the flashlight while he buried the body
13   parts.  They drove away from town to a wooded area.

14        [Petitioner] stopped the truck by a small clearing.  Jillian
     stayed in the vehicle and watched him dig a hole, using the
15   headlights for illumination.  The hole was wide but shallow, about
     two feet by four feet.  [Petitioner] turned the truck around, backing
16   the rear of the truck up to the hole.  Jillian saw [Petitioner] get the
     barrel out of the truck, tilt it on its side and "kind of shimmy it over."
17   [Petitioner] went behind Jillian and told her not to turn around.  She
     could "hear him dumping stuff into the hole."  She glanced behind
18   her, and saw Lyons' bloody pant leg and shoe, which she recognized
     because he always wore the same brand of tan work boots that laced
19   above the ankle.  [Petitioner] told her "don't look, just turn back
     around."  He dumped a kerosene heater in the hole and lit it on fire.
20   The fire went out quickly because it was raining.  [Petitioner] then
     "covered [the hole] up with dirt and... a bunch of brush."

21        [Petitioner] and Jillian returned to their home about 45
     minutes later, where Debra was waiting.  [Petitioner] was covered
22   with mud.  He said they needed to "to get rid of the truck," so Jillian
     and Debra drove Jillian's car and [Petitioner] drove the truck to a
23   Safeway parking lot in Santa Rosa, where they left it.

24        [Petitioner] "demanded" that Debra report to the police that
     Lyons was missing.  She did not want to, but he said he would "be
25   there in case they... were asking questions that [she] couldn't
     handle."  Debra called the police five days after Lyons was killed to
26   report him missing, and police came to the house.  She told the
     officers that Lyons was angry and depressed, though that was not
27   true.  Debra continued to receive Lyons's monthly disability checks
     at their post office box.  She deposited the checks into their joint
28   checking account, but never withdrew the funds.  About six weeks

1    after the killing, Debra's insurance company called to report that her
2    truck was in a Safeway parking lot in Santa Rosa.  She called the
     local sheriff and the Santa Rosa police who checked the truck before
3    releasing it to her.  After she claimed it, [Petitioner] "took it over"
     and "acted like it was his."

4        After the killing, Jillian and [Petitioner] moved in with Debra
     at the Ranch.  [Petitioner] asked Jillian to marry him, and they had
5    "his uncle who was an ordained minister... fill out the marriage
     certificate," which was dated March 10, 1998.  Several months later,
6    Jillian received a letter from the County of Lake stating that the
     marriage certificate "had never actually been filed because it had
7    been filled out improperly by the minister."

8        Jillian was afraid, because [Petitioner] had made threats
     against James and Debra when he was angry.  When Jillian got a job,
9    Debra was afraid to be alone with [Petitioner].  Jillian asked him to
     move out, and [Petitioner] moved in with a friend.  The couple was
10   still "together," and Jillian told [Petitioner] she loved him and was
     "not going to the cops...."  They fought after [Petitioner] accused
11   Jillian of dressing provocatively for church.  Jillian testified that he
     accused her of contemplating leaving him and "sleeping with some
12   guy during church when he should know how important God was to
     [her]."  After that, Jillian told him she did not want to be with him.
13   Right before they broke up, [Petitioner] asked Jillian to marry him
     again, but Jillian refused, explaining "God, you know, obviously
14   didn't want it to happen the first time and that we needed some time
     to figure out what was going on with this relationship."

15       Jillian obtained a restraining order against [Petitioner], which
16   prohibited him from coming near her, James, or Debra.  [Petitioner]
     then left town for about "eight months or a year."  During that time,
17   Jillian moved in again with Cherie.  Jillian "told her what happened"
     to Lyons.  Jillian testified that Cherie was not surprised, because
18   "she heard [Petitioner] threaten him just as much as I had."

19       While living with Cherie, Jillian met Cherie's brother Matt
     Jensen (Matt), a friend of [Petitioner]'s, and began a relationship
20   with him.  Matt had two children who "were getting taken away
     from their mother," but the court would not place them with Matt
21   because he had no place to live.  Jillian purchased a trailer in a
     mobile home park so Matt and his children could live with her.

22       Jillian had difficulties taking care of the children, and Matt
23   "started to not be around to help."  [Petitioner] returned, and began
     "hanging out" with Matt.  Though Jillian had a restraining order
24   against [Petitioner], she told him he could visit Matt at their home
     and she would not call the police.  One morning, [Petitioner] was
25   there and drove Jillian to work.  She was "so glad to be away from
     Matt... [and] it felt comfortable just like before."  Jillian told
26   [Petitioner] that she "want[ed] to leave town for a while" with him.
     [Petitioner] told her he loved her, and they "ended up in Santa Rosa."

27       [Petitioner] and Jillian returned after two days.  Before their
28   return, Jillian had called Debra to tell her where she was, and Debra

told Matt.  Matt saw Jillian and [Petitioner] at a gas station when they returned, and ran up to them holding a knife.  When [Petitioner] ran, Matt came "up behind him and stabbed him."  Matt was arrested and later convicted after [Petitioner] testified against him.

[Petitioner] and Jillian moved to Crescent City in 2000.  In October of that year, Lake County Sheriff's Detectives Dave Perry and Cory Paulich came to their home.  They told Jillian that Cherie had told them what happened to Lyons.  [FN3]  Jillian was afraid of being arrested, and [Petitioner] had been "real violent towards [her] lately."  Jillian told the detectives "exactly what had happened," with the exception of where Lyons's body was located.  [Petitioner] came home during the interview, but refused to give a statement to the police.  Jillian told him the detectives already knew about Lyons's killing because they had talked to Cherie.  [Petitioner] was very upset, because he did not know Jillian had told Cherie about the killing.  He said his life was over and they "needed to just leave," and had Jillian contact her mother.

FN3. Cherie and Detective Paulich testified that he took a written statement from her, which she signed, dated September 22, 2000, that indicated Jillian had told Cherie that [Petitioner] shot Lyons in the head and cut up his body with a chainsaw.  At trial, however, Cherie testified she did not remember that conversation with Jillian because it was years ago, she had four children and was "very busy."  A revelation that someone was shot in the head would not stick in her mind because she was "from Richmond."

Jillian called Debra to tell her the police "were up there to see her."  Debra was staying with her aunt in Yucaipa at the time. [Petitioner] got on the phone and told Debra she "better not say anything."  [Petitioner] wanted to marry Jillian in Las Vegas so they could not "testify against each other."  He sold their belongings and "signed [their] lease over."  Jillian got her last paycheck, and the couple left the same day.  They drove to Las Vegas where they were married in early October 2000.  Debra and Jillian's brother James acted as witnesses and were the only guests.  Jillian told Debra she "really didn't want to get married... [just] so she couldn't [testify against [Petitioner]]."

Debra returned to live with her aunt in Yucaipa.  The police located her there on October 16, 2000.  Debra did not want to talk to the officers, but eventually "didn't tell them a whole lot of truth, I told them a little just so they would leave me alone."  On Thanksgiving night of that year, Debra left Yucaipa and moved to Lake County with James.

Debra, James, [Petitioner] and Jillian all moved to Reno in late 2000 or early 2001.  They all found employment, and Jillian became pregnant.  After the baby was born in June 2002, [Petitioner] and Jillian split up and ultimately divorced.

In early 2005, Detective Perry and Paulich went to Debra's home.  She agreed to talk to them, and told them "everything."

**United States District Court**
For the Northern District of California

1
2
3

Debra convinced Jillian to speak with the detectives.  Jillian answered their questions and indicated she would return to Lake County to show them where Lyons's body was buried, which she did on March 14, 2005.

4
5
6

Two dogs trained and state-certified in recovering human remains (cadaver dogs) searched the area identified by Jillian that day.  Though both dogs "alerted" in the area, which they were trained to do when detecting any trace of human remains, no part of a human body was found.

7
8
9
10
11
12
13
14

In August 2005, three state-certified cadaver dogs and their handlers searched the identified area.  The first dog, named Twist, responded "to some sort of cadaver scent in that area."  The two remaining dogs searched the area separately, and each "alerted" within 18 inches to two feet of Twist's alert spot.  Deputy Perry dug in the soil in the are of the alert spots, but found no human remains or clothing.  Two dogs trained in finding historical bones were brought in that night, but also found nothing.  In October 2005, police brought in a backhoe to dig in the identified area, but nothing indicating human remains was found.  Dog handler Shirley Hammond concluded that, because the cadaver dogs alerted but the historical bone dogs did not, human remains had been in the area but moved.  She testified to her opinion, which she acknowledged was not supported by any scientific study, that the scent of human remains "rises and it's collected in the foliage of the trees and... brush," even though the leaves are renewed seasonally.

15

(Ans. Ex. 7 at 2-9.)

16
17

## DISCUSSION

18

I.    Standard of Review

19

This Court may entertain a petition for a writ of habeas corpus "in behalf of a

20

person in custody pursuant to the judgment of a State court only on the ground that

21

he is in custody in violation of the Constitution or laws or treaties of the United

22

States." 28 U.S.C. § 2254(a).  The writ may not be granted with respect to any

23

claim that was adjudicated on the merits in state court unless the state court's

24

adjudication of the claim:  "(1) resulted in a decision that was contrary to, or

25

involved an unreasonable application of, clearly established Federal law, as

26

determined by the Supreme Court of the United States; or (2) resulted in a decision

27

that was based on an unreasonable determination of the facts in light of the evidence

28

presented in the State court proceeding." 28 U.S.C. § 2254(d).

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Williams, 529 U.S. at 412; Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.), overruled on other grounds by Lockyer v. Andrade, 538 U.S. 63 (2003).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409. The federal habeas court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court. See Ylst v. Nunnemaker, 501 U.S. 797, 803-

04 (1991); <u>Barker v. Fleming</u>, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  When there is no reasoned opinion from the highest state court considering a petitioner's claims, the court "looks through" to the last reasoned opinion.  <u>See Ylst</u>, 501 U.S. at 805. Here, that opinion is from the California Court of Appeal.

The Supreme Court vigorously and repeatedly affirmed that under AEDPA, there is a heightened level of deference a federal habeas court must give to state court decisions.  <u>See Hardy v. Cross</u>, 132 S. Ct. 490, 491 (2011) (per curiam); <u>Harrington v. Richter</u>, 131 S. Ct. 770, 783-85 (2011); <u>Felkner v. Jackson</u>, 131 S. Ct. 1305 (2011) (per curiam).  As the Court explained:  "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'"  <u>Id.</u> at 1307 (citation omitted).  With these principles in mind regarding the standard and limited scope of review in which this Court may engage in federal habeas proceedings, the Court addresses Petitioner's claims.

C.      <u>Claims and Analysis</u>

As grounds for federal habeas relief, Petitioner raises the following claims: (1) ineffective assistance of trial counsel for failing to investigate potential impeachment witnesses to attack Jillian and Debra's testimonies and for failing to challenge the cadaver dog evidence, (Am. Pet. 6a); and (2) ineffective assistance of appellate counsel for failing to develop ineffective assistance of trial counsel claims and failing to notify Petitioner of the state high court's decision denying review, possibly barring federal habeas review, (<u>id.</u> at 6e).

1.      <u>Ineffective Assistance of Trial Counsel</u>

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88 (1984). Second, he must establish that he was prejudiced by

United States District Court

For the Northern District of California

1   counsel's deficient performance, i.e., that "there is a reasonable probability that, but

2   for counsel's unprofessional errors, the result of the proceeding would have been

3   different." Id. at 694.

4        The Strickland framework for analyzing ineffective assistance of counsel

5   claims is considered to be "clearly established Federal law, as determined by the

6   Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d)

7   analysis. See Cullen v. Pinholster, 131 S. Ct. 1388, 1403 (2011). A "doubly"

8   deferential judicial review is appropriate in analyzing ineffective assistance of

9   counsel claims under § 2254. See id. at 1410-11. The general rule of Strickland,

10   i.e., to review a defense counsel's effectiveness with great deference, gives the state

11   courts greater leeway in reasonably applying that rule, which in turn "translates to a

12   narrower range of decisions that are objectively unreasonable under AEDPA."

13   Cheney v. Washington, 614 F.3d 987, 995 (9th Cir. 2010) (citing Yarborough v.

14   Alvarado, 541 U.S. 652, 664 (2004)). When § 2254(d) applies, "the question is not

15   whether counsel's actions were reasonable. The question is whether there is any

16   reasonable argument that counsel satisfied Strickland's deferential standard."

17   Harrington v. Richter, 131 S. Ct. 770, 788 (2011).

18        The Court of Appeal rejected Petitioner's challenge that the trial court

19   improperly denied his motion for new trial based on his claim that trial counsel

20   provided ineffective assistance:

21              [Petitioner] argues that the trial court erred in denying his
         motion for new trial. He maintains that the motion should have been
22       granted because his trial attorney was ineffective in that he did not
         hire an investigator, failed to investigate potential witnesses who
23       would have testified about Jillian and Debra's motives to lie about
         [Petitioner] killing Lyons, and failed to interview witnesses who
24       would testify to his nonviolent character. [FN4] He claims this
         alleged ineffective assistance was prejudicial because his first trial,
25       in which substantially the same evidence [FN5] was presented,
         ended in a deadlocked jury, while his second trial resulted in a
26       conviction. [FN6]

27              FN4. [Petitioner] mentions in passing that his trial counsel
         consulted a "dog expert," but makes no argument that the
28       failure to do so resulted in prejudicial ineffective assistance of

1

2

3

4

counsel.  Given the testimony about the dog searches, no expert was required to opine that the search results were inconclusive.  (See *Jorgensen v. Beach 'n' Bay Realty, Inc.* (1981) 125 Cal.App.3d 155, 163 ["The correct rule on the necessity of expert testimony has been summarized by Bob Dylan: 'You don't need a weatherman to know which way the wind blows.'"] (Fn. omitted.))

5

6

FN5. [Petitioner] asserts the "only evidentiary differences between the first trial and the retrial was that two 'jailhouse snitches' testified at the first trial," but not the second.

7

8

9

FN6. In a footnote, he "separately urges that the deficiencies of his counsel denied him the assistance of counsel guaranteed under the Sixth and Fourteenth Amendments."  To the extent that this separate claim is properly before us on appeal, we find inadequate bases for it in the appellate record, as we discuss in the following sections.

10

11

12

13

14

15

16

*1. Standard of Review of Denial of Motion for New Trial*

The appellate standard of review regarding a motion for new trial depends on the procedural posture of the motion.  [Citation.]  We review the grant of a motion for new trial for abuse of discretion.  [Citation.]  Where the trial court has denied the motion, "the authorities are less clear regarding the standard of review.  [Citation.]"  [Citation.]  "When the court has denied a motion for a new trial,... we must determine whether the court abused its discretion by examining the entire record and making an independent assessment of whether there were grounds for granting the motion.  [Citation.]"  [Citations.]

17

*2. Ineffective Assistance of Counsel*

18

19

20

21

22

23

24

25

[Petitioner] maintains the trial court erred in its determination that his trial counsel was in ineffective, and consequently erred in denying his motion for new trial on that basis.  In order to demonstrate ineffective assistance of counsel, a defendant must show that counsel's performance was inadequate when measured against the standard of a "reasonably competent attorney," and that counsel's performance prejudiced defendant's case in such a manner that the representation "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  (*Strickland v. Washington* (1984) 466 U.S. 668, 686-687.)  "'In determining whether counsel's performance was deficient, a court must in general exercise deferential scrutiny [citation]... [and] 'although deference is not abdication,... courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight.' [Citation.]"  [Citations.]

26

27

28

"Prejudice must be affirmatively proved[.]"  [Citation.]  The defendant must show ""a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."...' [Citation.]"  [Citation.]  "'It is undeniable that trial judges are particularly well suited to observe courtroom

United States District Court
For the Northern District of California

performance and to rule on the adequacy of counsel in criminal cases tried before them. [Citation.]...'" [Citation.] "As we repeatedly have emphasized, unless the record reflects the reason for counsel's actions or omissions, or precludes the possibility of a satisfactory explanation, we must reject a claim of ineffective assistance raised on appeal...." (*People v. Ledesma* (2006) 39 Cal.4th 641, 746.)

*3. Declarations in Support of Motion for New Trial*

[Petitioner] claims he was denied the effective assistance of counsel because his attorney failed to hire an investigator, failed to investigate potential witnesses who would testify that Jillian and Debra had a motive to lie about [Petitioner] killing Lyons, and failed to uncover witnesses who would testify regarding [Petitioner]'s nonviolent character. [Petitioner] claimed the potential witnesses would "tell the jury how much Jill[ian] and Debra were lying... about my good character, at least as far as violence goes,... [and] about how Jill[ian] and [Debra] are nowhere near as sweet and straight as they pretend to be."

With his motion for new trial, [Petitioner] submitted his own declaration, that of Holly Harvey, and the declaration of private investigator Gary Hill (Hill). Hill interviewed potential witnesses Nickie Davison, Kelly Austin, Deana Tracy, Michael Delvalle and Arlene Altic, and spoke with [Petitioner]'s trial attorney.

Hill stated in his declaration that [Petitioner]'s trial attorney told him [Petitioner]'s "position was: 'I didn't do it, she's lying.' Since no alibi witnesses were apparently available, [counsel] did not feel that there was anything to be done factually."

Nickie Davison, [Petitioner]'s cousin, told Hill that she spent "a lot of time" with Jillian, yet Jillian never said anything about [Petitioner] murdering Lyons. Instead, she stated that Jillian told her Lyons "'disappeared after he met another woman on the [I]nternet.'" She also stated that [Petitioner] was a "wonderful person" whom she had never seen with a weapon or engage in violence.

Hill also interviewed Deana Tracy, [Petitioner]'s sister (Tracy). She stated that Jillian would "'look you in the face and lie.'" Tracy thought Jillian and Debra were "'very manipulative,'" and not really religious: "'The [B]ible thing is bullshit.'" Tracy also indicated that Jillian "smoked pot" and used "speed." Tracy stated that [Petitioner] would "'get beyond mad'" at times, and had "'attitude,'" but would never kill anyone.

Kelly Austin, who had known [Petitioner] for approximately 15 years, told Hill Davison was a "big teddy bear" who "does not have it in him to kill anyone.'" Hill also met with Joseph and Arlene Altic, an elderly couple who attended the Lyonses' church. Mrs. Altic told him that Jillian, Debra, and Lyons "'were not totally steady in their [church] attendance,'" though Debra was a teacher's aide at the church school for several years. Michael Delvalle told Hill he had heard Jillian, Debra and James talking about being afraid of [Petitioner].

United States District Court
For the Northern District of California

1    Holly Harvey, whose child's father was [Petitioner]'s cousin, signed a declaration stating that Jillian told her [Petitioner] did not kill Lyons, and that Lyons disappeared after meeting a woman on the Internet. She claimed Jillian told her she was worried about Debra getting in trouble for cashing Lyons's disability checks and "taking" Lyons's real property, and that she lied to the police to protect Debra. She also declared that [Petitioner] was a very loving and caring man who was "not capable of killing anyone," and whom she had never seen act violently or possess a gun.

*4. Failure to Demonstrate Inadequacy of Counsel's Performance*

[Petitioner] claims his trial counsel's performance was inadequate because he did not "investigate the case" and consequently his tactical decision were not informed. "[U]nless the record reflects the reason for counsel's actions or omissions, or precludes the possibility of a satisfactory explanation, we must reject a claim of ineffective assistance raised on appeal...." (*People v. Ledesma*, *supra*, 39 Cal.4th at p. 746.)

The record, however, does not reflect any reasons for the claimed failure to hire an investigator. There is no declaration from [Petitioner]'s trial attorney. Instead, [Petitioner] bases his claim of ineffective assistance on investigator Hill's declaration that [Petitioner]'s trial attorney told him, "Since no alibi witnesses were apparently available, [counsel] did not feel that there was anything to be done factually." This reveals nothing about the existence or extent of any investigation.

Additionally, the record does not reflect a complete absence of investigation. Hill acknowledges in his declaration that he reviewed investigative reports. [Petitioner]'s attorney told Hill that no alibi witnesses were available, suggesting some sort of investigation. The fact that [Petitioner]'s sister testified at his second trial, but not the first, reflects some sort of investigation. Simply because [Petitioner]'s trial counsel may not have hired an investigator does not demonstrate that he conducted no investigation.

The record also suggests that [Petitioner]'s attorney had access to an investigator at some point in the first trial. [Petitioner]'s attorney stated to the court on July 5, 2005, that he would " no longer have an investigator at [his] disposal," and that he had not been advised that anyone would be available to "replace Clearlake Investigations," suggesting that he had an investigator at some time.

More significantly, there were tactical reasons a reasonably competent attorney would choose not to investigate or present the evidence [Petitioner] now claims was critical. First, the positive character evidence uncovered by Hill was all in the form of opinions of his relatives or friends that [Petitioner] was not violent. The potential witnesses told Hill that [Petitioner] was a "wonderful person" and a "big teddy bear" who would never kill anyone. [FN7] Secondly, the introduction of evidence of [Petitioner]'s claimed nonviolent character would have opened the door to admission of substantial negative character evidence. In fact, Hill's investigation

uncovered negative information about [Petitioner]. [Petitioner]'s sister told Hill that [Petitioner] would sometimes "get beyond mad" and had an "attitude," while Michael Delvalle revealed that he had heard Jillian, Debra and James talking about their fear of [Petitioner]. Additionally, [Petitioner]'s probation report indicates that he had a prior misdemeanor conviction of battery and fighting in a public place. His trial counsel could reasonably conclude that introducing evidence of [Petitioner]'s claimed nonviolent nature might open the door to evidence of his past acts of violence and anger management issues.

> FN7. The potential witnesses all had significant biases: one was [Petitioner]'s sister, one was his cousin, one had a child with [Petitioner]'s cousin, and the fourth was a long-time friend.

Likewise, not investigating whether the potential witnesses identified by [Petitioner] had information that would establish Jillian's and Debra's motive to life about the killing was not an unreasonable tactical decision. There was no question that both Jillian and Debra had motives to lie about the killing, and had lied to the police in the past. Both women had a motive to want Lyons dead, based on his molestation of Jillian when she was a child. Additionally, Jillian testified she was afraid of getting in trouble based on her role in events after the killing. Debra was afraid she and Jill would be arrested as accomplices, and the detectives had told her she had a motive to kill Lyons, given that she continued to cash his disability checks. Debra's testimony revealed that her relationship with Lyons was troubled. They did not speak, because it was "better that way," and she did not like his attempts to control her actions. [Petitioner]'s attorney could reasonably conclude that testimony from [Petitioner]'s friends and relatives would only dilute the motive evidence, and might be perceived by the jury as less believable.

[Petitioner] also claims his attorney failed to investigate regarding potential witnesses who could attack Jillian and Debra's credibility and provide negative character evidence regarding their alleged hypocrisy regarding religion. Hill indicated he spoke with [Petitioner]'s sister Deana Tracy, who told Hill that Jillian was a manipulative liar who was not really religious. Hill also stated [Petitioner]'s cousin, Nickie Davison, told him that "'nothing ever cam up about this until Jill[ian] wanted to marry another man.'" Hill also interviewed Arlene Altic, who told him that Jillian's and Debra's attendance at church was not "'steady.'"

[Petitioner] now urges that his attorney failed to investigate his sister's information, yet [Petitioner]'s sister was a witness at his second trial. Hill's declaration, however, contains no reason why Deana Tracy did not reveal this information about Jillian's claimed bad character and [Petitioner]'s nonviolent nature before or during his first or second trials.

The information provided by Arlen Altic and Nickie Davison in this regard provided little aid to [Petitioner]. Arlene Altic's most damaging statement to Hill was that Jillian and Debra were not

United States District Court
For the Northern District of California

1
2
3

"'steady'" in their church attendance, yet she also stated they were members of the church for years and that Debra was a teacher's aide at the church school.  Nickie Davison provided no new information about Jillian's character or motives.

4
5
6
7

[Petitioner]'s attorney could have made the reasonable strategic decision that the juxtaposition about their lifestyle choices and actions after the killing provided a more compelling contrast. Additionally, his counsel reasonably could conclude that overt attempts to portray the women as hypocrites had the potential to backfire and alienate the jury.  And, such testimony may have lead to other witnesses testifying to Jillian's and Debra's good character.

8

[¶]...[¶]

9

*5. Reasonable Probability of More Favorable Result*

10
11
12
13
14
15

[Petitioner] first claims that the trial court "did not deny the [new trial] motion based on a lack of prejudice" and consequently respondent erroneously relies on the lack of prejudice on appeal.  We review the trial court's ruling, however, not its rationale.  "'"No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason.  If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion.'" [Citation.]"  [Citations.]

16
17
18
19
20

[Petitioner] also maintains that prejudice necessarily exists because the jury in [Petitioner]'s first trial deadlocked "six-six on evidence identical to that at retrial, except for the two 'jailhouse snitches.'..."  In order to demonstrate ineffective assistance of counsel, [Petitioner] has the burden to establish more than that "the alleged errors may have had some conceivable effect on the trial's outcome; [Petitioner] must demonstrate a 'reasonable probability' that absent the [alleged] errors, the result would have been different. [Citations.]"  [Citations.]

21
22
23
24
25
26
27

[Petitioner] has not demonstrated a reasonable probability of a more favorable result.  The fact that the jury in his first trial deadlocked, despite considering similar evidence, does not demonstrate a reasonable probability that the jury in his second trial would not have found him guilty in the absence of the claimed errors.  The record does not reflect the reasons for the deadlock in the first trial.  And, while the evidence was similar in the second trial, it was not, as [Petitioner] asserts, identical.  One significant difference was the testimony of Deana Tracy, [Petitioner]'s sister, who testified only at his second trial.  The jury, which was able to observe each witness's demeanor and assess his or her credibility, may have found his sister's testimony less than credible and damaging to his case.

28

Even had all the witnesses identified by [Petitioner] testified

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8

in the way he anticipated, their proposed testimony was either cumulative of other evidence, or potentially damaging from a tactical standpoint. Jillian's and Debra's credibility had been the subject of testimony and argument at trial, and the addition of [Petitioner]'s relatives' opinions that Jillian and Debra were manipulative liars added little. The evidence was undisputed that Lyons's body was never found, and the cadaver dog testimony was inconclusive regarding finding any human remains, much less identifying Lyons's remains. The addition of secondhand information that Lyons may have run off with a woman he met on the Internet added little to the undisputed fact that his body was never found. Accordingly, we cannot say that the trial court abused its discretion in denying [Petitioner]'s motion for new trial on the basis of his claimed denial of the effective assistance of counsel.

9       (Ans. Ex. 7 at 9-17.)

10                  a.      Failure to Investigate Potential Witnesses

11       Petitioner claims that counsel Douglas Rhoades was ineffective for failing to

12   investigate potential witnesses to attack the credibility of Jillian and Debra whose

13   testimonies was the weight of the prosecution's case-in-chief. Petitioner claims that

14   there were numerous individuals who were potential impeachment witnesses, i.e.,

15   Nickie Davison, Kelly Austin, Deana Tracy, Joseph and Arlene Altic, and Holly

16   Harvey. (Pet. 6a.)

17       This claim is without merit. First of all, the duty to investigate and prepare a

18   defense does not require that every conceivable witness be interviewed. Hendricks

19   v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995). Secondly, the state court gave a

20   detailed analysis under Strickland, 466 U.S. 668, in determining that counsel's

21   performance was not deficient because the record did not support Petitioner's claim

22   that Rhoades failed to conduct any investigation: (1) there was no declaration from

23   the trial attorney to this effect; (2) private investigator Hill acknowledged that he

24   reviewed investigative reports; (3) Rhoades told Hill that no alibi witnesses were

25   available which indicated that he had made some investigation; and (4)Rhoades told

26   the trial court at one point that he would "no longer have an investigator at [his]

27   disposal" and that no replacement would be available, which suggests that he had an

28   investigator at some time. See supra at 13.

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Furthermore, the state court found that there were tactical reasons why a reasonably competent attorney would choose not to present the witnesses suggested by Petitioner.  First of all, the statements from the potential witnesses – all of whom were Petitioner's relatives and friends – were largely opinions of his non-violent character: (1) Petitioner's cousin said he was "wonderful person" whom she had never seen engage in violence; (2) an old friend said he was a "big teddy bear" who "does not have it in him to kill anyone"; and (3) a woman who had a child with Petitioner's cousin said Petitioner was a very loving and caring man who was "not capable of killing anyone."  See supra at 12-13.  A reasonably competent attorney could conclude that the admission of the evidence of Petitioner's non-violent character would have opened the door to the admission of substantial negative character evidence, including a prior misdemeanor conviction of battery and fighting in a public place.  Id. at 13-14.  The information provided by the private investigator also included statements by Petitioner's sister that Petitioner would "get beyond mad" at times and had "attitude," and by Michael Delvalle who said that he heard Jillian, Debra and James talking about being afraid of Petitioner.  Id. at 12.

With respect to how these potential testimonies could have been used to attack the credibility of Jillian and Debra, the state court reasonably found that the trial court had tactical reasons for not using them as evidence.  The testimonies would have been redundant as the evidence already showed that Jillian and Debra had motive to lie about the killing and had lied to the police in the past: (1) both women had motive to want Lyons dead because he had molested Jillian as a child; (2) Jillian admitted she was afraid of getting in trouble based on her role in covering up the killing; (3) Debra was afraid of getting in trouble as an accomplice to the murder and for continuing to cash Lyons' disability checks.  See supra at 14.  Their credibility was clearly already called into question and presented to the jury to decide.  Furthermore, presenting evidence of their bad character, as suggested by Arlene Altic and Nickie Davison, may have lead to other witnesses testifying to

United States District Court

For the Northern District of California

1    Jillian's and Debra's good character, which would have had the undesirable effect of

2    bolstering their credibility.

3          The state court also reasonably determined that Petitioner failed to show that

4    he was prejudiced by counsel's failure to call the potential character witnesses.  To

5    establish prejudice caused by the failure to call a witness, a petitioner must show that

6    the witness was likely to have been available to testify, that the witness would have

7    given the proffered testimony, and that the witnesses' testimony created a reasonable

8    probability that the jury would have reached a verdict more favorable to the

9    petitioner.  Alcala v. Woodford, 334 F.3d 862, 872-73 (9th Cir. 2003).  The state

10   court reasonably found that the proposed testimony was "either cumulative of other

11   evidence, or potentially damaging from tactical standpoint."  See supra at 15.  As

12   discussed above, the potential witnesses all had perceived biases which makes it

13   unlikely that their opinion testimony would have swayed the jury toward a more

14   favorable verdict for Petitioner.  Furthermore, the admission of character evidence

15   would have also likely opened the door for negative character evidence against

16   Petitioner and good character evidence of Jillian and Debra, all of which would have

17   been more damaging for Petitioner.

18         Because Petitioner's trial counsel did not render ineffective assistance with

19   respect to potential impeachment witnesses, the state court's rejection of this claim

20   was not contrary to, or an unreasonable application of, Supreme Court precedent.

21   Petitioner is not entitled habeas relief on this claim.

22              b.    Failure to Challenge Cadaver Dog Evidence

23         Petitioner also claims that counsel was ineffective for "failing to advance a

24   Kelly-Frye, [sic] objection to challenge the testimony relating to the cadaver dogs,"

25   and for failing to inquire "into what expert testimony might be available to support,

26   or to contradict, the prosecution's cadaver dog scent theory, that the dogs are

27   infallible."  (Am. Pet. 6a, 6c.)  This claim was mentioned "in passing" in Petitioner's

28

1    direct appeal, and rejected on the merits.[3]  (Ans. Ex. 7 at 9, fn. 4.)

2         Expert testimony is necessary when lay persons are unable to make an

3    informed judgment without the benefit of such testimony.  See Caro v. Calderon,

4    165 F.3d 1223, 1227 (9th Cir. 1999) (jury informed that plaintiff exposed to

5    neurotoxic chemicals but not informed of the ramifications of such exposure).  If

6    experts need to be consulted, counsel must provide the experts with information

7    relevant to the conclusions of the expert.  Id.  But where the evidence does not

8    warrant it, the failure to call an expert does not amount to ineffective assistance of

9    counsel.  See Wilson v. Henry, 185 F.3d 986, 990 (9th Cir. 1999) (a decision not to

10   pursue testimony by a psychiatric expert is not unreasonable when the evidence does

11   not raise the possibility of a strong mental state defense).  The Ninth Circuit has

12   determined that failure to call an expert witness on the unreliability of eyewitness

13   identification does not constitute ineffective assistance because "skillful cross

14   examination of eyewitnesses, coupled with appeals to the experience and common

15   sense of jurors, will sufficiently alert jurors to specific conditions that render a

16   particular eyewitness identification unreliable," which precludes a finding of

17   prejudice under Strickland.  Howard v. Clark, 608 F.3d 563, 570, 574 (9th Cir.

18   2010).

19        Here, the state court rejected the claim because it found that "no expert was

20   required to opine that the search results were inconclusive."  See supra at 10-11.

21   Evidence at trial showed that there were three searches by different dogs of the area

22   identified by Jillian.  Id. at 7.  During the first search in March 2005, two state-

23   certified cadaver dogs "alerted" that they had detected human remains in the area,

24   but no part of a human body was found.  Id.  During the second search of the same

25   area in August 2005, three other state-certified cadaver dogs "alerted" to some

26   _____

27        [3]Although Petitioner raised the claim more explicitly in his state habeas
     petition, the entire petition was denied by the California Supreme Court as untimely.
28   See supra at 2, fn. 1.

United States District Court

For the Northern District of California

1   cadaver scent, but no human remains or clothing were found.  Id.  A third search was

2   conducted that same evening by two dogs trained in finding historical bones, but

3   they found nothing.  Id.  Dog handler Shirley Hammond testified that because the

4   cadaver dogs alerted but the historical bone dogs did not, it was likely that human

5   remains had been in the area but moved; she opined, while acknowledging the lack

6   of support by any scientific study, that the scent of human remains "rises and it's

7   collected in the foliage of the trees and... brush," even though the leaves are renewed

8   seasonally.  Id.

9           The state court was not unreasonable in rejecting this claim.  The California

10  Supreme Court in People v. Kelly, 17 Cal.3d 24 (1976), held that when faced with a

11  novel method of proof, there must be a "preliminary showing of general acceptance

12  of the new technique in the scientific community."  Id. at 30; see Frye v. United

13  States, 293 F. 1013 (D.C. Cir. 1923).  Under California Law, the dog tracking

14  evidence used in Petitioner's case was not subject to a preliminary showing under

15  Kelly because dogs are not uniform pieces of scientific equipment but rather

16  "animate objects" and "each and every [one] is an individual and is different from all

17  others."  (Ans. at 14, citing People v. Craig, 86 Cal.App.3d 905, 915 (1978).)  The

18  showing necessary to admit cadaver dog evidence required the prosecution – as he

19  did in this case -- to establish the particular dog handler's qualifications, the

20  particular dog's training and experience, and the circumstances in which the

21  particular dog was used.  Craig, 86 Cal.App.3d at 915-916.  Because the use of

22  cadaver dogs is not subject to the Kelly standard, trial counsel could reasonably

23  conclude that a "Kelly-Frye" objection would be futile.  Lastly, an expert witness

24  was not necessary because the nature of the evidence did not warrant it: the jury was

25  more than capable of considering the reliability of the dog handlers and their dogs

26  based on their respective qualifications, training and experience.  See Wilson, 185

27  F.3d at 990; see Howard, 608 F.3d at 570, 574.

28          Furthermore, the record shows that trial counsel did in fact challenge the

United States District Court

For the Northern District of California

1    reliability of the cadaver dog evidence.  Rhoades cross-examined the two dog

2    handlers who testified at trial and particularly called into question the circumstances

3    of the searches.  (Ans. Ex. 2 at 281-286, 318-326.)  Counsel also argued in closing

4    that the dogs were not infallible: "State certification is not a guarantee of accuracy.

5    It's not a guarantee that these dogs are infallible in any way." (Id. at 429.)  The

6    prosecution was also forced to admit that the dogs had made errors during their

7    training.  (Id. at 452.)  Because the reliability of the cadaver dog evidence was

8    already challenged at trial, it cannot be said that there was a reasonable probability

9    that additional expert testimony would have done anything more than show that the

10   inconclusive cadaver dog searches were indeed, inconclusive.  Accordingly, the state

11   courts' rejection of this claim was not contrary to, nor an unreasonable application

12   of, Supreme Court precedent.  28 U.S.C. § 2254(d).  Petitioner is not entitled to

13   habeas relief on this claim.

14              b.       Ineffective Assistance of Appellate Counsel

15           Petitioner's final claim is that his appellate counsel rendered ineffective

16   assistance for failing to develop the ineffective assistance of trial counsel claims

17   raised in the instant petition, and for failing to notify Petitioner of the state high

18   court's decision denying review, possibly barring federal habeas review.  (Am. Pet.

19   6e.)

20           The Due Process Clause of the Fourteenth Amendment guarantees a criminal

21   defendant the effective assistance of counsel on his first appeal as of right.  Evitts v.

22   Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of appellate

23   counsel are reviewed according to the standard set out in Strickland, 466 U.S. 668.

24   Smith v. Robbins, 528 U.S. 259, 285 (2000); Moormann v. Ryan, 628 F.3d 1101,

25   1106 (9th Cir. 2010); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).  First,

26   the petitioner must show that counsel's performance was objectively unreasonable,

27   which in the appellate context requires the petitioner to demonstrate that counsel

28   acted unreasonably in failing to discover and brief a merit-worthy issue.  Smith, 528

1   U.S. at 285; <u>Moormann</u>, 628 F.3d at 1106.  Second, the petitioner must show

2   prejudice, which in this context means that the petitioner must demonstrate a

3   reasonable probability that, but for appellate counsel's failure to raise the issue, the

4   petitioner would have prevailed in his appeal.  <u>Smith</u>, 528 U.S. at 285-86;

5   <u>Moormann</u>, 628 F.3d at 1106.

6        It is important to note that appellate counsel does not have a constitutional

7   duty to raise every nonfrivolous issue requested by defendant.  <u>See</u> <u>Jones v. Barnes</u>,

8   463 U.S. 745, 751-54 (1983); <u>Gerlaugh v. Stewart</u>, 129 F.3d 1027, 1045 (9th Cir.

9   1997); <u>Miller</u>, 882 F.2d at 1434 n.10.  The weeding out of weaker issues is widely

10  recognized as one of the hallmarks of effective appellate advocacy.  <u>See id.</u> at 1434.

11  Appellate counsel therefore will frequently remain above an objective standard of

12  competence and have caused his client no prejudice for the same reason--because he

13  declined to raise a weak issue.  <u>Id.</u>

14       Assuming that appellate counsel failed to discover and raise the claims at

15  issue, Petitioner fails to show that he was prejudiced by counsel's actions.  As

16  discussed above, the Court found no merit to any of the ineffective assistance of trial

17  counsel claims raised in this action and determined that the state courts' rejection of

18  those claims was not contrary to, or an unreasonable application of, Supreme Court

19  precedent.  <u>See supra</u> at 18, 21.  Petitioner has failed to show that but for appellate

20  counsel's failure to raise those claims on appeal, he would have prevailed.

21  Furthermore, Petitioner's second claim that appellate counsel failed to notify him of

22  the state high court's denial is without merit because he fails to show prejudice;

23  Petitioner was clearly not barred from pursuing federal habeas relief as evidenced by

24  the instant action.

25       Accordingly, Petitioner's ineffective assistance of appellate counsel claims

26  are DENIED as without merit.

27  ///

28  ///

**CONCLUSION**

After a careful review of the record and pertinent law, the Court concludes that the Petition for a Writ of Habeas Corpus must be **DENIED**.

Further, a Certificate of Appealability is **DENIED**.  See Rule 11(a) of the Rules Governing Section 2254 Cases.  Petitioner has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.  See Rule 11(a) of the Rules Governing Section 2254 Cases.

DATED: _____6/12/2014_____



EDWARD J. DAVILA
United States District Judge

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**

For the Northern District of California

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA


NATHAN L DAVISON,

          Plaintiff,

   v.

G SWARTHOUT et al,

          Defendant.

_____/

Case Number: CV10-02689 EJD

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on June 12, 2014, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.


Nathan Lee Davison F-46553
Pleasant Valley State Prison
P. O. Box 8500
Coalinga, CA 93210

Dated: June 12, 2014

Richard W. Wieking, Clerk
/s/ By: Elizabeth Garcia, Deputy Clerk

Order Denying Petition; Denying COA
N:\Pro - Se & Death Penalty Orders\June 2014\Davison02689_denyHC.wpd